Would the lawyers please identify themselves for the record? My name is Andrew Kreider. I'm a person of APD. I'm with the Reyes. Joseph Franey. I present in the segment of services. Thank you. I'm sorry, may I? What was your name again? Joseph Franey. Oh, okay. Ms. Franey. Thank you. I didn't know if your name was on there, and I see it, so. Mr. Kreider. Ladies and gentlemen of the court, counsel, again, my name is Andrew Kreider. I represent Ruben Reyes in this matter. The facts of this incident in sum begin on August 9, 2006 at approximately 930 a.m. Mr. Reyes was riding his bicycle on the sidewalk next to 31st Street in Cicero going in a westbound direction. Sorry to interrupt, Mr. Kreider, but we have read the briefs and we're familiar with the fact setting. Why don't you get right to your argument? Well, I just want one small fact. It's a small factually, but significant, I think. How much distance was there between the edge of the fence and the sidewalk? If your Honor would like, I believe there was a photograph. I know. Do you have that on the top of your head? The exact measurement? Well, approximately from the edge of the brick wall to the point where the sidewalk begins. Yes. Where the cyclist was trapped. I would estimate at a few feet. Yeah, the record is, even with the photograph, the record doesn't really give us dimensions. Like, for example, the fence, the gate, the fence. How tall would you say the brick part of the fence is? Because there's some wrought iron over it, isn't there? The testimony is somewhere between five and six feet tall. It's a brick fence, solid brick fence. On top of that is a foot or two. So there is opportunity, temporal as well as spatial opportunity, to creep and see beyond the obstruction of the fence itself. Is that correct? Actually, no. If you think of a solid fence and just picture yourself behind the wheel of a car. No, no, no. I don't want to do that yet. I want to know, in terms of a land surveyor, the car could have gotten past the fence into this no man's land, at which point visibility of the sidewalk would become apparent. Is that correct or incorrect? You are correct in that sense. I'm going to do like a cross-examiner. I'll cut you off here because I'll leave the rest to you in presenting your argument. Okay. In looking at that issue right there, we have a solid fence. Everybody agrees we can't see through a solid fence. But that's superficial. So Anna Mello-Morales is put in a position where she has to use this parking lot. She's instructed to use this parking lot by sequence. She has no other alternative. All right. Counsel, let me stop you with one other question because this is not designed to be indicative of any positions in this case, except for the fact that we've all read it and thought about it. But now that we have the Commerce Bank and Nichols versus Stas, and now that we also have Ziemba in our minds, which we are not stepping over these cases. Okay. So with Ziemba and the dominant follow, it seems to me that the critical component is that the vehicle exiting the driveway couldn't see. And that's what we have in this case as well. That was what the court used to not let the case go forward. The opposite is true here. Anna Mello-Morales could not see through the fence until such time as she got past that magical point into no man's land where she could see. But why isn't that controlled by Ziemba? Yeah, isn't that the same as Ziemba? That was the critical point was that the driver couldn't see because of the trucks. In Ziemba, I guess I felt in Ziemba there wasn't that allegation. They seem to say that no, the driver could see the roadway. What allegation in your complaint are you relying on? Paragraph 19 of the complaint that says failed to post mirrors. Failed to post mirrors, and I think it's paragraph 23. Can a driver rely on a mirror in this instance? I think a driver can rely on it. I don't see how any careful driver could ever leave a parking lot and rely on a mirror to let them think that they can be careful and go forward without actually looking in the direction that she needed to look. I think that she did, and she tried. Now she said that she looked to the left. Counsel, the rule, do you think also the restatement that the landowner in his duty to safeguard abutting highways has no duty to anticipate the negligence of a third party in causing the occurrence? I guess to the extent that I think that it is likely that an accident is going to happen under our factual pattern. I think that Rafen has a fact pattern that's almost identical in my opinion. It's a snow pile that's blocking the view of both drivers. And I liken it to our case because Morales' view is obstructed and so is Ruben Reyes' by this solid brick wall. But even in Rafen, there's a distinction between the area of egress from the position where you can't see in the facts of this case. I mean, anybody who has driven a car understands that if you're inching out into a roadway where the cars could be going 40 miles an hour or faster, it's a much dicier proposition than if you have a few feet of space between leaving the place where you can't see and running into a sidewalk where people might be violating the ordinance and riding a bicycle. It doesn't cause the same element of danger or risk to the driver. And parenthetically, it's interesting that the driver in this case looked to her left first when the left was presumably safer because of the mirror on the right instead of looking to the right because there was no mirror there. But leaving that aside, I'm not sure that Rafen's facts situation is really that comparable to the facts situation here. I respectfully disagree. I mean, when we distill down Rafen in this case, what we have is an obstruction that no one can see through. Now, is it the right mirror that's not functioning or is it the left? It is the left. As you're exiting, the mirror on the left is missing. And that would help see the right, where he was coming from. That would have showed Mr. Reyes coming down on the sidewalk. And that's exactly why these mirrors were installed. She said she was in the middle of the driveway, didn't she? She approximated her position in the middle of the driveway, yes. And didn't she say she had to do that so she could see? Wasn't that part of her? What? She just said that she was going out the middle. She had to slowly creep out until such time as she could bend forward and see past it. And you would think in a driveway that was described as being able to accommodate basically two cars going side to side, that somebody who couldn't see to the right would be on the left side of the driveway, especially when she was familiar with the driveway and the absence of the mirror. But instead, she's in the middle and looking to the side where the mirror would show somebody coming. And again, that goes to the restatement question of the responsibility of a landowner for the negligence of a third party. Well, particularly where it involves a duty that is extended against the landowner to guard against pitfalls outside of his property, as opposed to traps on his premise. I look at it, number one, I don't know that two cars can fit through that way. But that's what the record says. That's what her estimate is. But even if there are not two cars, you're not confined into the middle there. That's clear from the record. You could go to one side or the other. You're in a designated exit. But the reality is, you can't see past that wall until you're already on the front of your vehicle. When he reaches that point, he's still not in danger, at least from the hazard involved under the facts of your case. Because the hazard commences in the area of the sidewalk. If he has several feet, that's an area in which there is no danger, but simply inconvenience. And while it may be foreseeable that people will not take good care of themselves, the duty imposed under Ziemba on the landowner refuses to accommodate to that lapse by the third party in fulfilling his duty that he may have to oncoming or intersecting traffic. I believe the fence creates a zone of danger every time a car exits. While the zone of danger is something reminding me of Ricky involving a negligent infliction of emotional distress, I don't know of any other zones of danger that are creatures of judicial fear. Well, if we're talking about the wall itself and what effect does this wall have? The wall creates, and maybe we can put it a different way, a period of time each time a car exits that driveway where the driver's blind and the people on the other side of the sidewalk are blind. And it's not until a car gets past that wall that it opens up, okay, everybody can see each other. So what does a reasonable driver do in that circumstance? One recognizes that they can't see through a wall. One recognizes that somewhere outside the stone wall is a sidewalk on which people could be walking or if they're in violation of the ordinance, riding a bicycle. And one doesn't exit at anything other than a creeping rate of speed to be able to take a look. Regardless of the mirror, that person has to creep. They cannot rely on a mirror. It's the wall that's the problem. The mirror is a temporary fix. Is the wall the problem or is the driver the problem? The wall's the problem. Well, somehow that's where, although the whole dichotomy between cause and condition has been repudiated, at least by the scholars. The one area where it has some viability other than simply foreseeability is the one you mentioned. The wall is there. And just because the wall may be a causative factor, if it's not the exclusive causative factor, if its causative impact could be avoided by a third party who is under a duty to avoid it, then the landowner will not, according to the Ziemba, be liable, regardless of how you read Raffin or how you read Adams. Because in the Adams case, Justice Hoffman chased at the idea of abandoning simple foreseeability but accepted the fact that our Supreme Court in Ziemba nevertheless established that as the law. See, this is where I think Raffin comes in. Because in the very end of Raffin, Raffin says the distinction between the phrasing of the allegations of the ones in this case and the one in Ziemba is that the allegations in the present case set forward facts under which the defendant is liable. Well, of course, you know, the obvious distinction between Raffin is, I think, the fact that there was no intermediate zone, as you would put it, that could have avoided the injury, because I think the injury took place as soon as there was any step, the smallest step taken past the obstruction, as opposed to this case where there is this, you know, no man's land area, which would have permitted avoidance of the accident. A second distinction with Raffin is that there the obstruction was an act of commission, while here the it happens. The two cars come out because they can't see each other. The impact happens because there's nothing that anybody can do to avoid it. The same thing is true here. She's creeping out the best she can. Counsel, you know, if wishes were true, what you said would be true. But in point of fact, we have those few feet that stand between you and your argument. The distance between the fence and the sidewalk, which would have permitted some control over the egress of the third party, which could have overcome the obstacle of the wall. Even if what you say is true, you have a situation where it's a much different proposition to be creeping into an area between a fence and a sidewalk and creeping into a roadway where people might be going at a high rate of speed with a car. The worst you're risking creeping into the area that Justice Gordon referred to as the no man's land is that you might be struck by a pedestrian or a bicyclist violating the ordinance, which is a whole different proposition from sticking the hood of your car out into a roadway blind. But then we're looking at, you know, we're saying, well, in a low speed situation there's no case, but in a high speed one there would be. No, we're saying that the Raffen case, which is in essence, you're holding up against Ziemba, really isn't analogous to this situation. Let me clarify my position about the couple feet then, Your Honor, because the no man's land, the car has a front, whether it be a couple of feet or a big Cadillac with a bunch of feet. And it's got to get that front beyond the fence before it can see around it. Well, that is a critical question. Well, I think it is too, because then it goes back to Raffen. If the impact occurs simultaneously, as soon as it gets past the snow pile, there's no way to avoid it. The same is true here. The car has to creep out a certain amount of time before the driver sitting behind the wheel can peer around the brick fence. She was past that fence. She was past that gate. The testimony is that it happened seconds after she passed over. The testimony is that she creeped out. She looked to her left. And then, she said, when she turned, the bike hit her. Isn't that really what her testimony is? No. She's creeping out. What I believe, and I took her deposition, what I believe her testimony is, she's creeping out very slowly because she can't see through the fence. And she realizes that the mirror's missing. In her testimony, if you read her deposition, she relied on the mirror. Oh, she said for a month she didn't rely on it. She knew it wasn't there. She knew for a month it wasn't there, and she said she couldn't rely on it. She knew that the mirror wasn't functioning. She said she didn't have any problems. I guess that goes back to my original question. I don't know how anyone could rely on the mirror when they're coming out of that gated, I don't think mirror. The mirror wasn't there, so she didn't rely on it. When she looked to her left, she didn't look at the mirror on the right. Right? Correct. She looked to the left. She was going out left, and the only way she knew she could get out safely turning left was to look left. And then, she knew the only way she could get out safely to the right was looking to the right, not relying on a mirror on either side. I mean, I don't know how anyone could rely on the mirror to safely exit. And I guess that goes to the problem. Let's say that the mirrors are missing for a second. They're gone. They were never there. You still have the fence. The fence is the problem. And the fence, I believe, is what distinguishes my case from Ziemba. In Ziemba, my reading of it is that the driver exiting the driveway can see the roadway. Except for a several, for an extended period of time, that fence existed without any mirrors. And it was of recent vintage, relative to the age of the fence itself, that the mirrors were installed. And further, there was no pitch to the trial court of the voluntary assumption of any duty. So that's precluded on the appeal, from argument on appeal. But without that, we have a question. Would it have occurred to anybody to sue the owner of the premises for not installing mirrors if he chose never to have installed the mirror? That's a rhetorical question. That can't be answered by the rector. But, you know, it's questionable whether anyone would have even considered that this landowner owed some sort of affirmative duty to provide a safer manner of egress from his premises. I don't know. I'm not going to base anything I do in this case on the fact that you encounter this situation almost in every driveway that you pass. Somewhat different, I would say, than every driveway you pass. I would liken it more to a parking garage right down on the street where you're exiting a parking garage. Yeah, you can't rely on those mirrors. You really can't. I mean, it's I don't know how someone can rely on the mirror to get out safely. But I want to go to this one other question. We can go back to this. The court concluded there was no proximate cause. You haven't responded in your brief. What is your position since you haven't responded to her alternative part of her order where she said that you cannot establish proximate cause as far as sequent? Well, I think that we did touch on proximate cause. I think it goes hand in hand with the duty question. And going hand in hand, it ultimately comes down to Well, she said there was no duty. That's one. That is not what I'm talking about. She said that you were not able to establish proximate cause for sequent. And I guess I would argue that number one, it's a question for a jury. And I look at this and say That's not in your brief. You don't respond. When you don't respond on appeal to a particular ruling, you've kind of We appealed the order of the court. You have to respond to her order that said no proximate cause. You haven't put that into your brief. In our opening brief, we discussed the duty. In our reply brief, we did talk about the proximate cause issue. But I think that they go hand in hand. And that's my position. I think that the court, in order to have on appeal. And I believe that it has been addressed. Maybe not as much as the other issues. But I believe that it has been addressed. And at the end of the day, it's an issue for the jury if this court finds that there's a duty. And that's my position on it. May I ask you, Mr. Kreider, you have referred to the statute that was in place regarding the building construction. Now your opponent says that this was grandfathered. But there's a question of fact. Truly, when it went up. Now, how do you work that into your complaint? Is it in there? Is that in there already? If you're broadly reading any complaint, yes it is. It's a failure to maintain. The statute that's on the books for the city of Cicero pardon me, the ordinance that is on the books in the village of Cicero does mandate that people are not supposed to construct walls that would obstruct the view of people walking on the sidewalks and roadways. So that went into effect, I believe, in 1999. One of the people testifies that they believe that it was built in 97 or 98, but the answer is interrogatory. The CUN filed actually say that it was built in 2001 after the initiation of the ordinance. Put that aside. When it was built, when it was constructed, there's a further ordinance which requires them to maintain the fence if it's grandfathered in. Well, that's not in the briefs. We don't have that. But it's in the response to summary judgment. The other part of the ordinance? Yes, they're cited one right after the other. But where is it in your brief? It's just referenced as to the... The ordinance is at page 15 of your brief, but I didn't see any reference to that section. To the maintenance issue? I think I just generally described it as the ordinance. Maybe it's this B, that the property owner shall be responsible for the maintenance? Is that what you're talking about? Correct. So irrespective of when it was actually built, I think there's an ongoing duty to keep a brick fence in proper maintenance for the safety of those that it's looking to protect, which is people on the sidewalk or adjacent roadways. So I guess going back to your original question, too, how do I reconcile my case with the Adami case and the Ziemba case? I think that there's a specific notation in there that in the absence of any statutory or legislative duty, we're not going to find one. But here there is that. Well, when we talk about the duty you say that was to maintain it, are we left with the mirror again? Not really, because the wall is the initial problem. You can't see through the wall, and that's why I liken that to the snow pile. It's a clear obstruction at the intersection. So they had a duty to destroy the wall? Or once they built the wall that was in violation of the ordinance, they then had a duty to maintain it or make it safe, which is exactly what Seguin did. They had one of these foster parents complain that they couldn't see through the wall. So they took it up at their safety meeting, at their safety committee. The safety committee looked at it and said, yeah, let's put mirrors on it. We'll make it safer. Okay, now I want to go back to this. What is the evidence that the lack of the mirror caused this accident? What is it? Morales testifies in her deposition that she couldn't see through the wall, number one, given. She also testifies that she relied upon the mirrors. She testifies that the mirror would have given her whole visibility down to the corner. But if that was a concern, Mr. Kreider, then we go back to the questions I raised 15 or 20 minutes ago. Her behavior was even more negligent if you build into it the fact that she had relied on the mirror in the past and was conscious of the fact that the mirror was absent. Her behavior is the exact opposite of what somebody who was in that situation should be expected to do. And the question then becomes, again, whether or not the absence of the mirror is the problem or the negligence of the driver is the problem. And it becomes sort of a combination, which is what you have in Raytheon, where you've got this combination of events. And that's what, in my opinion, makes this case go forward. That Morales has filed a counter claim against Sequin. There's no way that you could sell Raytheon without accounting for Ziemba because of stare decisis. So the question is, what is it in Raytheon that is distinguishable from Ziemba and would also characterize the facts of this case? Well, what's distinguishable is that in Ziemba the driver could see the roadway. Here, we don't have that. That's distinguishable, same as in Raytheon. The other thing is, too, there's a local ordinance which would make a duty present in this particular case. That's distinguishable. The other thing is, too, I mean, Ziemba is limited somewhat in that it was dismissed on the pleadings. I mean, here we've got a case that's more muscled up in terms of what's going on in a totality of circumstances. And I would liken it almost in some ways to the Ziencena case, where that was a similar situation. Snow piled, the two parties couldn't see each other, and the plaintiff was actually a passenger in the vehicle that was creeping out and got hit. Well, there was no room within which a driver could have become alert to the oncoming vehicle. Well, I would disagree with that. Because if that were the case, Zienca would have to repudiate Ziemba. And in point of fact, Zienca doesn't even mention Ziemba. It's similar in the sense that the plaintiff's vehicle has to creep out, creep out, creep out, creep out. It seems to be a total divergence from Ziemba or any attempt to distinguish. Then maybe that's why we need some clarity on these cases, because we've got two Supreme Court cases, in my opinion, that are at odds. We've got two appellate court decisions, one from the first and one from the second, which in my opinion are at odds. My case, I feel, is stronger than all of them. My case, I believe, has the exceptions. First of all, in Ziencina, the occurrence took place on a public highway. It did. And the city or the municipality or the state agency was responsible for the obstruction of the public way. So that immediately places it out of the context of Ziemba, which deals with obstructions on private premises towards traffic using the public highway, as opposed to obstruction placed on a public highway by the municipality or by the state agency charged with the responsibility of maintaining the safety of the roads. And that's probably why the Supreme Court doesn't even bother distinguishing or involving the Ziemba analysis into its analysis in that case. I don't know. But factually, I look at these cases as right on point. Frankly, I was somewhat surprised that there was no reference to Ziemba, but there was none at all. But Rafen goes on to discuss, and I humbly submit that Rafen is very, very close to our case, and my case is stronger in the sense that there's the statutory obligation by the ordinance for the village of Cicero. So given all of those things, I absolutely believe that there was a material issue of fact here that should have been decided, left to be decided by a jury at the lower level. Thank you. You took the onslaught very well. Thank you, Your Honor. Counsel, if I may, before you even start, I'm very interested in the ordinance of the village of Cicero and how you get around that ordinance and its imposition of an independent duty, a statutory duty, so to speak, that would not be restricted by the common law rules that Ziemba and the other projects dealt with. There are a couple of matters that come into play with respect to the ordinance. Firstly, this is an illegal bicycle rider on the sidewalk, and that same set of ordinances provides that it is illegal to be a bicyclist on the sidewalk in the business district. But doesn't that just go to whether he was contributory negligent in his actions as opposed to us determining as a matter of law? A xenophobic ordinance? I think it goes to the interpretation, that you interpret the ordinances together, and to properly interpret the class of persons protected by the ordinance 318, you need to examine it in relation to the surrounding ordinances, which say that a bicycle rider cannot be on the sidewalk in the business district, and that that then excises that person from the potential class of people that you're desiring to protect. Couldn't you turn that around and then say that if the ordinance that requires the maintenance of the fence in a safe manner for the public was violated, then that should trump the fact that there was a bicyclist rather than somebody looking up at the sky who is struck? The maintenance provision? Well, that's not a safety statute that would create a duty as opposed to the 318 statute. So I don't see 322 as creating a duty, but also the idea of needing to maintain the fence, that's all it's saying is that you have to. Well, let me say it's not a safety statute when it says any fence which is not maintained in a safe condition according to the director of the code enforcement may be declared a nuisance. It mentions safety right in the ordinance. But to the extent they're referring to safety, you're dealing with the upkeep of the structure. They're not envisioning mirrors being placed on these structures. They're envisioning crumbling over time, and that could crawl into the sidewalk. But that would be a safety. What about changing the mirror? There were mirrors put up to assist drivers exiting. So one of the mirrors we know has been damaged and it's not functioning. So isn't that part of the maintenance? I don't think that's a part of the maintenance of the fence. I don't see when I read that statute. Let's examine if you're satisfied with that answer. Let's examine your initial premise that it envisions walls that are crumbling. It has a good sound to it, but it has no logic to it. Because what you're saying in effect is that if you build the wall originally to obstruct the traffic, you're free of the ordinance. You're only going to run in and counter the ordinance if you build a wall that doesn't obstruct initially, but degenerates into an obstruction. Now, that doesn't make a lot of sense, frankly. I'm sorry, Your Honor, I didn't fully follow. Well, I... Well, you've interpreted the ordinance your way as opposed to interpreting it multiple ways, and there's nothing in the language of the statute that tells us that your interpretation is the only interpretation. You're saying that it's just a matter of keeping the bricks and the mortar as opposed to building something that prohibits visibility in the first instance. From the get-go, so to speak. If you build something from the get-go that obstructs the traffic, you're saying that the ordinance would not apply to it, the ordinance would only apply to a wall that, because of erosion, degenerates into an obstruction. That distinction doesn't work. It should be, if anything, in the reverse, because if the ultimate erosion is controllable, a for surari, the initial construction should be prohibited, if it is constructed in a manner that obstructs it. What about this? You've got an ordinance. Now, there's a question about when the gate-fenced area was built. True? True. So, let's assume, maybe, that the ordinance is in play. Now, you've got a complaint that says that there should have been some kind of warning. I'm not talking about the mirrors now. The complaint alleges a lack of warning. Now, should there be, is there a question of fact that because they have this gate, it has a brick wall, that does prohibit visibility from the people on the sidewalk, that there should be some kind of a warning for those pedestrians, bicyclists, you know, garage ahead, you know, or gated something? Well, at the summary judgment stage, you look at what the evidence has revealed, and there's no evidence of record from the plaintiff bicycling that his vision was in any way obstructed. I don't find that anywhere in the record. So, to be able to support that, I don't think that the burden has been met as needed at the summary judgment stage. Point of fact, didn't the cyclist have access to the mirror that would have been useful to him, because wasn't it the right side that was still intact? I'm not certain. Right side. No, he's coming from the right side. Don't the facts suggest that the cyclist basically ran into this car? They do suggest that. But doesn't that show that the cyclist couldn't see the car either coming out? That no evidence was presented that he couldn't see the car. He offered no testimony on that point. So for us to try and make leaps, you know, maybe he was kind of looking up at the sun enjoying the day. What about the mirrors and the maintenance of the vets? I'm sorry. Is there a question of fact whether the mirrors, had the one that was broken been in place, have prevented the accident? There is no question of fact on that. The evidence as laid out in my brief, the evidence establishes that visibility was provided before even entering the space between the sidewalk and the fence. I thought she said she didn't have visibility. That's why she had to creep out. I would like to see the record site that says that she was creeping out. The only creeping out reference that I'm familiar with is when she was talking about her practice all along the years. She talks about how she would creep out so carefully and look from side to side and that she was aware that there would be others about. Well, if you look at the picture, it's in the record. I don't see how anyone could come out without creeping because there's a likelihood they could hit a pedestrian or a bicyclist if they don't slow the edge out. I don't know how else you could come out of this. There's a brick structure. How high do you think the brick structure was? He says five feet. It was around five feet. So the car is from the ground to the top of the car, in your opinion, greater or less than that five feet? Or do you even know? Does the record disclose that? It's not clear to me from the record on that point. You don't think the picture shows that you have to creep out of that garage, that parking lot rather, to avoid contact with somebody on the sidewalk or a bicyclist? Not only do you have to creep out, but you're statutorily required to stop before entering the sidewalk area. But your argument is that regardless of what the driver should have done, there's no evidence that that was done in this case. The evidence at the summary judgment stage is that she was going five, looking in the light most favorable, I guess five, because it says five to ten miles an hour going out. So you have to give plaintiff five, I guess, that she was going five miles an hour. I don't consider five miles an hour a creep. You're covering a lot of feet per second when you're going five miles an hour. So that's the point here is that you're dealing with Ziemba and Ziencia, trying very hard to distinguish Ziemba. But these don't have the kind of facts that could support taking the duty that rests with the driver and ripping it and putting it, foisting it upon the landowner. And I do just want to, counsel said he had trouble. Except perhaps under that ordinance. Well, the ordinance, everything comes back to causation at the end of the day. Oh, there's no question here about cause and fact. You could have more than one cause converging or acting in concert with another cause. That would, if anything, be a question of fact to the extent that this driver was impacted by the absence of the visual aid that, according to her testimony, she had in the past referred to. She may be negligent, but that does not preclude negligence on the part of the owner of the premises as well. If we're talking about cause and fact, if we're talking about proximate cause, or what they call legal cause, then we're talking about foreseeability and duty and all that. Well, I would suggest that there is case law that does hold that if there's a statutory duty to stop, okay, that breaks the causal connection. Court v. City of Harvey is a First District case, and they found that because there was a statutory duty to stop at an intersection that the driver should have been aware of, that that broke the causal connection. Which one is that in your brief? That one is not in my brief, but Cross v. Mooring is in my brief, which is another case involving an intersection where they talk about the need to stop, that the woman had a stop sign. And because she had a stop sign, the court was not willing to impose a duty. Well, then you're talking about proximate cause. You're not talking about cause and fact. You're talking about ultimately the element of foreseeability, which is what seems to be the controlling element generally in distinguishing between a cause and condition. I think that's the only viability left to that dichotomy. I would submit that when the testimony is that she had a mirror allowing her to see completely one way, and that she testifies that she was able to look one direction before reaching that sidewalk, then you have a situation where if she had stopped at the sidewalk, that would have broken the causal connection, because if she had stopped at the sidewalk and performed her duty, she had that opportunity. There are a lot of cases that have gone way beyond the refusal to go past the negligence of the third party. The intervening human agency connection, like the Lee v. O'Connor case, where you have a robbery on an elevated platform, obviously the robber had a duty not to perform the robbery, but he was assisted by the CTA in establishing conditions conducive to encouraging robberies, and the CTA is held liable. You know, we're talking textbook, hard book law now, and it's, if anything, depends on a case-by-case analysis, but the mere fact that the third party is not going to observe the law is not in and of itself sufficient as a natural exercise of logic to inhibit the liability of the owner of the premises in which the illegal act is performed, because people now recognize that human beings who may have free will in every other domain are nevertheless subject to predictability under foreseeability constructs. And my last point on that would be also that when she describes the accident, did not make use of the mirror that was available to her, and that it would be conjecture to assume that putting this other mirror there, that she would have made use of it, and that that also goes to the causation issue. But is it really foreseeable in a life type of approach, is it foreseeable that people who don't have mirrors, that accidents will increase where visual aids are kept out, even where the visual aid is not the exclusive means by which visibility can be achieved? Obviously, it's more foreseeable that without the mirror, there is a greater likelihood of something happening in that intersection than there would be with that mirror. The question is, how far does the Supreme Court want us to go with that? And that's where you have other factors coming into play, like public policy factors and the like, economic factors, and things of that nature, which the court was very cognizant of in Zimbabwe. Open up the floodgates. Mr. Farini, the ordinance. One of your basis for rejecting it is that it was enacted in 1999, but there's testimony that the gate, fence, whatever, it could have been erected after that date. The next thing you argue is it doesn't create a private right of action. Is there anything else that you want to say in response to the ordinance? It wasn't led in the complaint, we know that. What else? Apart from that, the arguments I make in my brief are that no duty was breached and that there was no proximate cause for any duty. So when I was making all these arguments on proximate causation and on breach in the brief, I'm referring to all the duties. And in my view, the concept of the stop and the need to stop can sever the causal connection. The evidence of record where she says, one, that she had no difficulty, even given the condition of the fence, that she was careful, and that she clearly had the ability to look both ways, that that severs the causal connection. So I would add those as bases on which to overturn the ordinance. Thank you, Mr. Perini. Any final words, Mr. Kreider? In sitting here for the better part of an hour, it's occurred to me that this case is all about whether there was a material issue of fact. And listening to these arguments, I feel like how can we walk out of here saying that there's not at least different inferences that can be drawn from the evidence? It's not there where the Supreme Court stops the analysis of the facts in favor of other kinds of considerations. Yeah, because, well, whatever considerations enters into the idea of imposing burdens on landowners with regard to third parties. But for this particular case, the duty that's being asked for Seguin to accept is the same duty that they already did, that they were already prepared to do, and that they had been doing prior to this accident, but then the mayor's gone, and then they failed to repair it. They failed to keep that fence in a state of repair and safety. And they have a maintenance step specifically reserved for them. But the question still remains whether it was their duty to take the step that they took and whether the failure to maintain it brought them below the acceptable level of the maintenance for the safety of others. Before you even get to the issue of whether somebody was riding a bicycle on the sidewalk is in that protected class. The duty question is one... Do you anywhere in your complaint allege that the absence of the mirror prevented Morales from seeing oncoming traffic? I think paragraph 19 of the complaint goes for that. That was something Ziemba and Adams pointed out, the failure. But yours, you're going with paragraph 19? Paragraph 19, paragraph 23, and the specific allegations contained in the account against Morales, I believe taken together, do suggest that the absence of the mirror prevented her from seeing through the wall. That, taken with her testimony that she didn't see through the wall and the depositions, it's clear that that's what's going on here. So I believe that has been properly left. When I look at the picture of this wall, I look at it and say, how can there not be a material issue with that? And if that's the core question here, that's why I believe the decision from the undercourt should be reversed. Thank you both for a very fine argument. Stimulating briefs and stimulating arguments. And we'll take the matter under advisement and issue a ruling in due course. Thank you.